# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-65


**STATE OF LOUISIANA**

**VERSUS**

**DESMYNE JOSEPH HENRY**



**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 8159-17
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## D. KENT SAVOIE
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Candyce G. Perret, Judges.


**CONVICTIONS AFFIRMED; SENTENCES VACATED; AND REMANDED WITH INSTRUCTIONS.**

**John Foster DeRosier**
**Calcasieu Parish District Attorney**
**Elizabeth Brooks Hollins**
**Assistant District Attorney**
**Post Office Box 3206**
**Lake Charles, Louisiana 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Desmyne Joseph Henry**

**SAVOIE, Judge.**

On April 11, 2017, Defendant, Desmyne Joseph Henry, was charged with one count of distribution of a Schedule 1 controlled dangerous substance (synthetic marijuana), a violation of La.R.S. 40:966(A)(1), and one count of introducing contraband into jail, a violation of La.R.S. 14:402(A). The second count was subsequently amended to charge a violation of La.R.S. 14:402(E) instead of La.R.S. 14:402(A). After a three-day trial, on October 12, 2017, a unanimous jury found Defendant guilty of one count of distribution of a Schedule I controlled dangerous substance (synthetic marijuana) and one count of possession or introduction of contraband in jail. Defendant filed a Motion for New Trial, which was denied by the trial court on October 27, 2017.

On October 20, 2017, the State filed a habitual offender bill, alleging Defendant to be a fourth or subsequent felony offender. Thereafter, on January 5, 2018, the trial court adjudicated Defendant a fourth or subsequent felony offender and sentenced Defendant as a fourth habitual offender for distribution of a Schedule 1 controlled dangerous substance to life imprisonment without benefit of probation, parole, or suspension of sentence. The trial court ordered the sentence to run concurrently with any previously imposed sentences and with any other sentence. For possession or introduction of contraband in jail, the trial court sentenced Defendant to five years, to run concurrently with any other sentences. On February 8, 2018, Defendant filed a "Motion for Amendment, Modification or Reconsideration of Sentence," which was denied by the trial court on December 14, 2018.

On March 21, 2018, Defendant filed a Motion for Appeal, which was granted by the trial court on June 11, 2018. Now before the court is a brief filed by

Defendant alleging five assignments of error – two alleging insufficiency of the evidence as to both convictions; one alleging the trial court erroneously allowed the introduction of other crimes evidence; one alleging improper argument as to Defendant's failure to testify; and the final one alleging the mandatory life sentence was excessive in this case. For the reasons that follow, we affirm Defendant's convictions, vacate Defendant's sentences, and remand this matter with instructions.

## FACTS

On March 3, 2017, Defendant was an inmate at Calcasieu Correctional Center. Defendant gave another inmate a tissue containing synthetic marijuana and instructed the inmate as to where to deliver the substance.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is an error patent concerning Defendant's habitual offender sentence for distribution of a controlled dangerous substance, Schedule I, and an error patent concerning his sentence for introduction of contraband into or upon the grounds of a state correctional institution.

On October 22, 2019, the Louisiana Supreme Court rendered the following per curiam opinion in *State v. Lyles*, 19-203 (La. 10/22/19), __ So.3d __ (footnotes omitted), a case in which the issue was raised:

> We granted the application to determine whether defendant's habitual offender status and sentence are governed by La.R.S. 15:529.1 as it existed at the time of the commission of the crime, as it was amended by 2017 La. Acts 282, or as it was amended by 2018 La. Acts 542. Finding Act 282 applies, we reverse the court of appeal, vacate the habitual offender adjudication and sentence, and remand with instructions to the district court for further proceedings.

2

On November 11, 2016, a St. John the Baptist Parish jury found defendant guilty of an aggravated battery, La.R.S. 14:34, he committed on February 1, 2015. On November 16, 2016, the State filed a habitual offender bill of information alleging two predicate offenses—a 1991 distribution of cocaine conviction and a 2004 manslaughter conviction. On February 13, 2017, the district court adjudicated defendant a third-felony offender and sentenced him to the life sentence mandated by La.R.S. 15:529.1(A)(3)(b) (effective August 15, 2010). The court of appeal vacated the habitual offender sentence and remanded for resentencing because of the trial court's failure to vacate the underlying aggravated battery sentence. *State v. Lyles*, 17-0405 (La. App. 5 Cir. 2/21/18), 239 So.3d 1055. After remand, the district court resentenced defendant on March 12, 2018, to the same term of imprisonment under the same provision of law. Defendant appealed.

On appeal, defendant contended that the Habitual Offender law, as amended by 2017 La. Acts 282, should be applied to him. Among other changes, this act reduced from ten to five years the time allowed—commonly known as the cleansing period—between expiration of correctional supervision for one offense and commission of the next offense on the habitual offender ladder. Defendant's probation for distribution of cocaine expired in 1996 and he did not commit manslaughter until 2003. Therefore, defendant contended he was a second-felony offender subject to a sentencing range of 3 1/3 to 20 years imprisonment under the amended law.

Defendant relied on Section 2 of Act 282, which provides, "This Act shall become effective November 1, 2017, and shall have prospective application only to offenders whose convictions became final on or after November 1, 2017." The State, however, relied on a subsequent amendment to the Habitual Offender Law in 2018 La. Acts 542 to argue that the district court applied the correct version of the Habitual Offender Law (i.e., the one in effect when defendant committed the crime in 2015). According to the State, despite the language of Act 282, the legislature subsequently clarified its intent with Act 542, which added La.R.S. 15:529.1(K).

The court of appeal agreed with the State, and found the district court sentenced defendant under the correct version of the Habitual Offender Law:

> Upon review, we rely on the well settled jurisprudence that the law in effect at the time of the offense is determinative of a defendant's punishment, including for habitual offender proceedings. [*State v. Parker*, 03-0924 (La. 4/14/04), 871 So.2d 317; *State v. Sugasti*, 01-3407 (La. 06/21/02), 820 So.2d 518; *State v. Williams*, 03-0571 (La. App. 5 Cir. 11/12/03), 862 So.2d

3

108.] Further, we find that by enacting subsection K, the legislature clarified its original intent that the date of commission of the underlying offense be used to determine the sentencing provision applicable to a habitual offender, except as otherwise explicitly provided in the statute. Therefore, after review, we find that the Habitual Offender Law in effect at the time of the commission of defendant's underlying offense of aggravated battery should be applied in determining defendant's habitual offender sentence, and the trial court did so correctly when imposing defendant's enhanced sentence of life imprisonment without benefits.

....

Accordingly, we find that the 2015 version of La. R.S. 15:529.1(A)(3)(b) is the sentencing provision applicable to defendant herein because his third felony (the aggravated battery conviction) and his predicate conviction of manslaughter are crimes of violence under La. R.S. 14:2(B)(5) and La. R.S. 14:2(B)(4), respectively. Additionally, defendant's 1991 conviction for distribution of cocaine in violation of La. R.S. 40:967(A) was a violation of the Uniform Controlled Dangerous Substance Law punishable by ten years of imprisonment or more. La. R.S. 40:967(B)(4). Under the habitual offender statute as it existed at the time of the commission of the underlying offense of aggravated battery, defendant was subject to an enhanced mandatory sentence of life imprisonment without the benefit of parole, probation, or suspension of sentence. *See* La. R.S. 15:529.1(A)(3)(b). For the foregoing reasons, we find that the trial court correctly applied the Habitual Offender Law in effect in 2015 in sentencing defendant.

*State v. Lyles*, 18-0283, pp. 9–10 (La. App. 5 Cir. 12/27/18), 263 So.3d 930, 938–939.

The question presented is one of statutory interpretation, which begins "as [it] must, with the language of the statute." *Bailey v. United States*, 516 U.S. 137, 143, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995). "Unequivocal provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning." *State v. Oliphant*, 12-1176, p. 5 (La. 3/19/13), 113 So.3d 165, 168; *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("In any event, canons of construction are no more than rules of thumb to help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before

all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' ") (citations omitted).

As noted above, the relevant portion of Act 282 provides: "This Act shall become effective November 1, 2017, and shall have prospective application only to offenders whose convictions became final on or after November 1, 2017." 2017 La. Acts 282, § 2. By contrast, Act 542 added new Subsection (K) to R.S. 15:529.1:

> K. (1) Except as provided in Paragraph (2) of this Subsection, notwithstanding any provision of law to the contrary, the court shall apply the provisions of this Section that were in effect on the date that the defendant's instant offense was committed.
> (2) The provisions of Subsection C of this Section as amended by Act Nos. 257 and 282 of the 2017 Regular Session of the Legislature, which provides for the amount of time that must elapse between the current and prior offense for the provisions of this Section to apply, shall apply to any bill of information filed pursuant to the provisions of this Section on or after November 1, 2017, accusing the person of a previous conviction.

2018 La. Acts 542, § 1 (effective August 1, 2018).

We note at the outset, from the plain language of these provisions in conjunction with the effective dates of the acts, the legislature appears to have created three categories of persons potentially affected by these provisions:

1. There are persons—like the present defendant—whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed before that date. Those defendants would be eligible to receive the benefits of all ameliorative changes made by Act 282.

2. There are persons whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed between that date and August 1, 2018 (the effective date of Act 542). Those persons would be eligible to receive the benefit of the reduced cleansing period, and they may also have colorable claims to the other ameliorative changes provided in Act 282, although we need not decide that question today.

3. Finally, there are persons whose convictions became final on or after November 1, 2017, and whose habitual offender bills were

filed on or after August 1, 2018. They would receive the reduced cleansing period by operation of Subsection K(2) added by Act 542 but their sentences would be calculated with references to the penalties in effect of the date of commission in accordance with Subsection K(2) added by Act 542.

The State urges, and the court of appeal found, essentially, that the legislature intended what it wrote in Act 542 but did not intend what it wrote in Act 282, and therefore Act 542 should be applied because it "clarifies" Act 282. However, the language indicating that Act 282 "shall become effective November 1, 2017, and shall have prospective application only to offenders whose convictions became final on or after November 1, 2017" is quite clear. Therefore, we must presume the legislature meant what it said, and the judicial inquiry ends there.

The State, however, attempts to breathe ambiguity into this language by questioning when a conviction becomes final. That question is readily answered by Code of Criminal Procedures articles 914 and 922, and the State's desire that finality be determined differently for purposes of the Habitual Offender Law than in other contexts does not suffice to introduce ambiguity into the clear language the legislature chose.

We find that 2017 La. Acts 282, § 2, which provides that Act 282 "shall become effective November 1, 2017, and shall have prospective application only to offenders whose convictions became final on or after November 1, 2017" is unequivocal, and therefore not subject to further judicial construction. For persons like defendant, whose convictions became final on or after November 1, 2017, and whose habitual offender bills were filed before that date, the full provisions of Act 282 apply. Accordingly, we find defendant was adjudicated and sentenced pursuant to the wrong version of the Habitual Offender Law. We reverse the court of appeal, vacate the habitual offender adjudication and sentence, and remand for further proceedings. On remand, the district court is directed to apply the version of the Habitual Offender Law, La.R.S. 15:529.1, as it was amended by 2017 La. Acts. 282, and before its amendment by 2018 La. Acts 542.

Defendant falls within the first category discussed above because his conviction is not yet final, and his habitual offender bill was filed October 20, 2017. It is clear the trial court sentenced Defendant under La.R.S. 15:529 (A)(4)(b) which required a mandatory life sentence without benefit of parole, probation, or suspension of sentence. The trial court sentenced Defendant under

6

the pre-Act 282 version of the habitual offender statute. In accordance with *Lyles*, Defendant was eligible to receive the benefits of the ameliorative changes made by Act 282. Accordingly, Defendant's habitual offender sentence is vacated, and the case is remanded for resentencing.

Next, Defendant received an indeterminate sentence for his conviction of introduction of contraband into or upon the grounds of a state correctional institution. Although the court minutes and the commitment order reflect that the sentence was ordered to be served in the Louisiana Department of Corrections, the sentencing transcript does not so indicate. Louisiana Revised Statutes 14:402 requires imposition of a sentence of up to five years with or without hard labor. The trial court's failure to indicate whether the sentence is to be served with or without hard labor rendered it indeterminate. Therefore, the sentence is vacated, and this matter remanded for resentencing, with the trial court instructed to specify whether the sentence is to be served with or without hard labor. *State v. Ervin*, 17-18 (La.App. 3 Cir. 12/13/17), 258 So.3d 677.

### ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO

In assignments of error numbers one and two, Defendant argues that the evidence was insufficient to convict him on both counts. The crux of Defendant's argument is that the State failed to negate the reasonable probability that Defendant was misidentified as the perpetrator of both offenses. In assignment of error number three, Defendant challenges the admission of other crimes evidence introduced at trial. When the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The rationale is that when the entirety of the evidence is insufficient to support Defendant's conviction, Defendant must be

discharged as to that crime, and any other issues become moot. *State v. Hearold*, 603 So.2d 731 (La.1992). Accordingly, we will address the sufficiency of the evidence first.

The standard of review in a case of identification is well-established:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297; *State v. Neal*, 00-0674 (La. 6/29/01), 796 So.2d 649. Positive identification by only one witness is sufficient to support a conviction. *Weary*, 03-3067 at p. 18, 931 So.2d at 311; *Neal*, 00-0674 at p. 11, 796 So.2d at 658; *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State v. Bright*, 98-0398, p. 22 (La. 4/11/00), 776 So.2d 1134, 1147.

*State v. Hughes*, 05-992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051 (alteration in original).

*Evidence at Trial*

The first witness to testify at trial was Jered Bellar, a corrections officer involved in the incident at issue. On March 3, 2017, Officer Bellar was supervising two trustees as they served "chow" to each of the inmates in each dorm. One of the trustees, Officer Bellar testified, was Tyrese Andrews. According to Officer Bellar, Mr. Andrews was patted down as usual before he began serving chow. When asked if anything extra was found on Mr. Andrews,

8

Officer Bellar replied, "No, sir." Officer Bellar then testified as follows regarding the events that ensued:

A. Well, after we pat them down, we go to - - at the time I was working at B-Pod. We were in - - we'd go to B-1; we start usually B-1 and then go around to B-8. Well, we go to B-1; we start serving, and Mr. [Andrews] grabs a handful of those forks they use to eat, goes inside the dorm and starts handing them out to everybody, which normally we don't usually see anything wrong with that because a lot of the trustees want to get the job done. So I figured at the time he was just wanting to get the job done. So I didn't think anything of it.

Well, he stopped and talked to Mr. Henry and - -

Q. You say "Mr. Henry." Who is Mr. Henry?

A. Desmyne Henry.

Q. Do you see him in the courtroom today?

A. Yes, he's right here.

Q. Okay. Would you please point him out for the record and state what he's wearing.

A. He's right there. He's wearing a white T-shirt and black tie - - or a white polo shirt and black tie.

**MR. MURRAY:**

Judge, let the record reflect he's identified the defendant sitting at counsel table.

**THE COURT:**

All right.

**BY MR. MURRAY:**

Q. All right. So you saw him start talking with Mr. Henry?

A. Yes.

Q. Okay. And continue, please.

A. I saw him talking to Mr. Henry, and I knew they knew each other. They'd talk every now and then or every time he comes to serve. Well, at the time I noticed Desmyne motion something, kind of

give like a little hug to him. And when he walks out of the - - and he stopped serving - - he stopped giving his forks out. When he walked back out, I noticed he had a piece of paper sticking out of his pocket. And I asked Mr. Andrews, I'm, like, I asked him, like, "What's that in your pocket?" He goes - - he looks down. He says, "It's nothing." I'm like, "Okay. It wasn't there awhile ago, so I need to know what it is."

So I take it, I open it up, and it had this substance of - - it looked green and brown to me, like green, brown leafy substance.

Q. Okay.

A. And I shut the door, and I asked Andrews what - - "Where did you get this?" and he didn't say anything.

Officer Bellar testified that when confronted, Defendant denied giving the substance to Mr. Andrews.

Officer Bellar reiterated that Mr. Andrews did not have anything extra on him when he began serving chow and stated that Mr. Andrews did not come into contact with anyone else after he met with Defendant:

Q. Okay. So Desmyne Henry then was the only person that he had gotten that close to, and it was after that embrace that you had seen something - -

A. Yes.

Q. - - extra on his person?

A. That's correct.

Finally, Officer Bellar testified that he was told to write up Defendant for passing a green and brown plant-like substance to another inmate.

On cross-examination, defense counsel asked if Officer Bellar had any knowledge as to whether Mr. Andrews had been searched prior to coming into Officer Bellar's presence on the day in question. Officer Bellar replied:

A. As long as I've worked there, the supervisor who's in charge of A-Pod where Andrews is located, or was located at the time, he was

10

always real strict about getting that done. So I fully, 100 percent, believe he was searched prior to coming to B-Pod.

Q.   But you don't have personal knowledge regarding that, do you?

A.   Personal knowledge? Like I said, as long as I've worked there, - - and it was for two years I've worked there - - and they've never not searched anyone.

Q.   Okay. Never not searched anyone? How do you know that?

A.   Because I've worked A-Pod before, and we were always told to search them, and we always have searched them.

Q.   I don't want to belabor this, but as a matter of literal fact, you don't have personal knowledge whether or not he was searched prior to this? Personal knowledge?

A.   As a matter of literal fact, I do not.

According to Officer Bellar, Mr. Andrews came into physical proximity of Defendant about fifteen minutes after Mr. Andrews arrived at the pod. When asked how many people Mr. Andrews interacted with prior to interacting with Defendant, Officer Bellar answered:

A.   I don't know the exact number, but as I was watching him, he was just walking by, handing his forks out, and then he went and talked to Mr. Henry.

Q.   He came into close physical proximity to several different prisoners, though, prior to being close to Mr. Henry, correct?

A.   Not close - - not as close as he got with Henry.

Q.   Agree. Not as close but close physical proximity with several different prisoners, is that correct?

A.   Within - - within a few inches, yes.

When asked to describe the interaction between Mr. Andrews and Defendant, Officer Bellar replied:

A.   Andrews walked to Henry, and Henry came and met him about halfway.

11

Q.    All right.    And you're saying that on direct examination, I believe, that Mr. Henry hugged Mr. Andrews?

A.    In a manner of speaking.    It was more of embrace, like, as if two really good friends would; but in a manner of speaking, yes, a hug.

Officer Bellar estimated that he was about seven or eight feet away from Mr. Andrews and Defendant.    When asked if he personally witnessed Defendant give something to Mr. Andrews, Officer Bellar replied:

A.    What I saw was them embracing each other, and then Andrews walking back with a piece of paper in his pocket.    That's what I witnessed.

Officer Bellar acknowledged that he did not "necessarily see [Defendant's] hands because Andrews' body was blocking his hands."    When asked if he watched Mr. Andrews' every move, Officer Bellar responded:

A.    I mean, I was watching his every move like we're supposed to.

Q.    You were watching Mr. Andrews' every move?

A.    Yes.

Q.    And you weren't watching anybody else?

A.    I have - - I can see them out of my peripheral vision.    I wouldn't go back and forth to each inmate, but I saw mostly him, because when a trustee goes into a dorm, we mostly concentrate our attention on them.

Q.    Okay.    I understand that, but you're saying - - you are acknowledging that your attention was not fixed on Mr. Andrews the whole time he handed out every spork.    You may have noticed movement in your peripheral vision, but you weren't fixated on him every time, right?

A.    I guess you could say that, even though most of my attention was on him.

On re-direct, Officer Bellar explained that the substance he found on Mr. Andrews was in a pocket located on the front of Mr. Andrews' shirt.    The

following colloquy then took place as to whether Mr. Andrews could have received the substance from one of the other inmates:

Q.    Based on the interaction with the other inmates, would he have been in a position to get something in his pocket, or would it have only been the way that the interaction occurred with Mr. Henry?

A.    The way I saw it, it was very unlikely that one of the other inmates could have done it because the pocket is so high.  Whenever he embraced Desmyne Henry, that's along the lines of when it could have possibly happened.

Q.    He had access at that time - -

A.    Exactly.

Q.    - - to that pocket?

A.    Yes.

Q.    Now, let me also ask you this.  Just a little common sense question here.  The defense counsel asked you about time, okay, the time that he took to go around, the time from how long he embraced Mr. Henry.  If he had gotten that piece of paper from another inmate, would he have had time to fold it down a little further into his pocket to where it wouldn't have been seen?

A.    Yes.

Q.    Based on the interaction with Mr. Henry and the quick hug, embrace, and then turning around, doesn't give much time for him to do anything with it, does it?

A.    It does not.

The State's next witness was Tyrese Andrews, an eighteen-year-old inmate who was incarcerated in Sulphur at the time of trial.  Mr. Andrews testified that he was being incarcerated for his convictions of two counts of simple burglary and two counts of theft of a firearm.  Mr. Andrews testified that on March 3, 2017, he was incarcerated in the Calcasieu Correctional Center.  On that date, Mr. Andrews worked as a trustee, serving food.  According to Mr. Andrews, all of the food was loaded onto a cart and served to the inmates in their dorms.  Mr. Andrews recalled

interacting with Desmyne Henry while serving chow and identified Desmyne Henry as the Defendant in open court. Mr. Andrews explained his interaction with Defendant as follows:

> A.      As I served the B-Pod, first we served 1 through 8. And after I went to 8, we had to pick up the trays. So we went back to B-1. As I served, because B-1, I guess, is, like, maximum lockdown or whatever, - -
>
> Q.      Okay.
>
> A.      - - only one inmate is, I guess, like, allowed out, like, every hour. So all the other inmates were locked down. We had to bring trays to the cell.
>
> Q.      Okay.
>
> A.      I guess Mr. Henry was the only one that wasn't in a cell. So as I was coming back from grabbing a tray from a cell, he stopped me and told me to pass this to Cell 7. He had placed something in my pocket.
>
> Q.      Okay.
>
> A.      And as that happened, I don't know - - I don't remember the guard's name, but me and him made eye contact. And as I walked away, as soon as I stepped out the door, he had asked me, "What's this?" I'm like, "I don't know." He had pulled it out of my pocket, and it seemed like - -like to be some tobacco.

When questioned further by the State, Mr. Andrews reiterated that Defendant asked him to take the tobacco-like substance to Cell 7, Block 7.

Mr. Andrews further testified that after the incident, he received a note from Defendant telling Mr. Andrews that Defendant would bond him out of jail if Mr. Andrews "took the charge." About two or three weeks later, Mr. Andrews had another interaction with Defendant in the "rec yard," where Mr. Andrews did not see Defendant's face but recognized Defendant's voice:

> A.      He told me, "What did you tell the people?" I told him, "Nothing." He said, "That's good." He said, "I would pop you off when I get back to the dorm."

Q.      What did he mean, "pop you off"?

A.      I guess like give me - -

     . . . .

Q.      What did you take it as?

A.      Like, "Give me some tobacco" or something like that.

Q.      Did you respond to that?

A.      I said, "I'm straight."

Q.      Okay. Meaning?

A.      I don't want none.

     . . . .

Q.      Did he make any threats to you at that time?

A.      Yes, sir. It was, like, "Good, because I don't want to beat you up, little nigger," something like that.

Mr. Andrews testified that he stayed away from the rec yard after that because he felt threatened. According to Mr. Andrews, he was later transferred to another facility.

The State then asked Mr. Andrews if he saw Defendant in the holding cell of the courthouse the day prior to his trial testimony. Mr. Andrews testified that he did see Defendant the day prior to his testimony and testified that Defendant told him to "plead the Fifth." Mr. Andrews nodded his head, affirming that he would "plead the Fifth." Finally, Mr. Andrews testified that he was not offered a plea deal for testifying, that he testified truthfully as he remembered the event in question, that he did not have any reason to lie, and that he accepted full responsibility for the charges to which he pled.

On cross-examination, defense counsel questioned Mr. Andrews about his prior convictions, reiterating that Mr. Andrews was eighteen years old and had been convicted of two counts of simple burglary and one count of a theft of a firearm. Defense counsel also asked Mr. Andrews if he had been charged with possession of narcotics in connection with the incident in question:

Q.     Are you charged with possession of narcotics?

A.     No, sir.

Q.     So a few moments ago when Mr. Murray was inquiring and asked whether or not you were offered any deal, - - is that correct?

A.     Yes, sir.

Q.     But you're not charged with possession of narcotics?

A.     No, sir.

Q.     So whatever happened here that day, although you got caught redhanded with narcotics, you're not charged with possession of narcotics?

A.     The guard seen him place it in my pocket, sir.

Q.     The answer is yes or no. You can explain your answer afterwards.

A.     No.

Mr. Andrews testified that he did not know Defendant before this incident and had never spoken to Defendant before this incident. When asked how he recognized Defendant's voice during the interaction in the rec yard, Mr. Andrews testified that he recognized Defendant's voice from when Defendant told him to pass the substance to Cell 7, which was the only time Defendant had heard Defendant's voice.

Defense counsel questioned Mr. Andrews about his previous convictions, stressing that Mr. Andrews claimed to have never committed any crimes other than the ones for which he had been convicted:

Q.    All right.  Have you committed any burglaries that you have not been convicted of?

A.    No, sir.

Q.    You never - - you just happened to get convicted the two times that you committed simple burglaries?

A.    Yes, sir.

Q.    Have you committed any other crimes that you haven't been convicted of?

A.    No, sir.

Q.    You just happened to get convicted the three times that you committed crimes?

A.    It was four times.

Q.    Four times.  What's the fourth one?

A.    Two counts of theft of a firearm - -

Q.    Oh, you - -

A.    - - and two counts of simple burglary.

Q.    Okay.  Two counts of theft of a firearm.  Did you steal two firearms?

A.    Yes, sir.

Q.    So you've only committed four crimes in your life, and you got [sic] all four times and convicted all four times?

A.    Yes, sir.

Q.    That's your testimony?

A.    Yes, sir.

Finally, defense counsel asked Mr. Andrews if he told one of the deputies that someone named "Nelson" gave him the substance at issue. Mr. Andrews responded that he "thought his name was Gerald at first[.]" On re-direct, Mr. Andrews testified that he did not know what Defendant had placed in his pocket.

Ann Clifton, the evidence supervisor for the Calcasieu Parish Sheriff's Office, identified S-1 as evidence that was submitted to the crime lab. The crime lab report described the item submitted as a sealed envelope containing green plant material in tissue paper. The lab report identified the item as synthetic cannabinoid, Group 19, Schedule I.

Regarding other crimes evidence, Roy Malone, a Calcasieu Parish Sheriff's Deputy, testified that on August 24, 2010, Deputy Malone participated in an investigation of Defendant, whom Deputy Malone identified in court. Deputy Malone was contacted by a confidential informant (C.I.) who stated he could make an undercover purchase from Defendant. Deputy Malone described one purchase as follows:

> A.    On arriving, we met Mr. Henry at one location. I want to say it was a barbecue stand. Then we traveled to a house, a residence on Hunter Street, and there we purchased crack cocaine.

On a second occasion, crack cocaine was purchased from Defendant at an apartment complex.

Regarding another other crimes incident, Robert Waggoner, a patrol officer with the Calcasieu Parish Sheriff's Office, testified that he was working as a corrections officer on December 20, 2014. On that date, Officer Waggoner searched Defendant's jail cell and found a cell phone in Defendant's pillow.

Jody Savoie, a B-Pod supervisor with the sheriff's office, was also involved in an investigation of Defendant on February 18, 2017. Officer Savoie described the investigation as follows:

A.    After we did the 2230 head count, we did - - met in central, like usual. We ended up going to do a shakedown in B-1 at the time, which we basically go look for contraband, any type of stuff like that that aren't supposed to be allowed. And we entered - - or was approaching the door, I notified for the deputy in the tower, "Flash the lights, rack the inmates up."

When we popped the door, I saw Inmate Henry go to Cell 1 where he was housed. We went in, started getting everybody out, strip-searched them, you know, see if they might have hidden any contraband. At that time when we walked in, we went to - - Deputy Smith went to Cell 1, just because I told him, "Hey, I saw him run into the cell. Go check that out right off the bat."

Went in there. He ended up coming out with a bag of synthetic that was in the Ramen noodle pack.

Officer Savoie believed the substance found was synthetic marijuana based on his experience and based on the substance's texture, odor, and color.

Bayne Smith, another sheriff's deputy, also testified regarding the February 18, 2017 search involving Defendant. Deputy Smith described the incident as follows:

A.    It started with we were doing a shakedown of the tiers which is, you know, a random search, and we met up in central that evening and we decided we were going to shakedown the tier that Desmyne was staying in.

And we gathered at the door of the tier, and the deputy in the tower, which is - - they control the doors from there - - she closed the door, and at that time when the door started to close, I noticed Desmyne going up to his cell and trying to get into his cell before the door closed. And he did get into his cell before the door closed.

And after that, we entered the tier. After everything was secure, then we strip-searched all the inmates. We secured them, and then we began our search. And I went to Desmyne's cell first, due to the abnormal behavior of trying to go into the cell before the door closed,

and I found a baggy of suspected synthetic marijuana inside a bowl of Ramen noodles.

Officer Smith clarified that nothing was found on Defendant when he was strip-searched. Officer Smith also testified that Defendant was the only resident of the cell at the time of the search.

Mike Abate, a detective at the Calcasieu Correctional Center, investigated an intimidation charge involving Defendant and Tyrese Andrews. Detective Abate became involved in the investigation when he was monitoring Defendant's phone calls. Detective Abate testified that he knew it was Defendant during one particular call because he recognized Defendant's voice and recognized the person he was talking to as one of Defendant's regular callers. During the call, Defendant asked the individual if he knew a guy by the name of Tyree or Tyrese. According to Detective Abate, the individual asked Defendant if Defendant wanted him to get the business crew together to talk with Tyrese. Defendant responded, "No, Don't worry about that. He's in jail right now." Concerned about what was going on, Detective Abate had Tyrese Andrews escorted to his office and asked him if he and Defendant had talked since the incident back in B-Pod. Mr. Andrews stated that they had, and Detective Abate described their interaction as follows:

> A. I asked him to elaborate on that. He said that probably about two weeks to a week prior to me talking to him, he said he was out on rec, Desmyne Henry was in his cell, which the cell to the isolation cells where he was being housed at this time, there's a rec yard for A-Pod for the trustees to go play basketball, do whatever. He could watch him, and he was yelling through the window. And he apparently told - - asked Tyrese if he said anything to the police.
>
> Made him an offer, "Hey, I can get you bonded out of jail" if he'd take the charge. He supposedly asked Tyrese if he had said anything. Tyrese told him no. I asked Tyrese if he was, you know, scared for his safety in jail since he was so young. He said yes. He said he hadn't been to rec since that incident.

20

Detective Abate further testified that he noticed Defendant had a large amount of commissary:

A.    It was about three bags full of commissary, like duffle bags, the mesh ones, just from the ground up to about right here (indicating).

Q.    Big laundry bags?

A.    Yeah.

Q.    Full of it?

A.    Full.

Q.    How much does a typical inmate have in commissary?

A.    A typical inmate might have about one bag maybe half full.

Detective Abate described commissary as anything an inmate can purchase from the store—chips, food, writing materials, stamps, shirts, underwear, and hygiene items. Detective Abate estimated that Defendant had about $800 worth of stuff from the commissary. The commissary records, however, showed that Defendant had not been to the store within a month or two of Detective Abate's discovery of the items. Roger Pete, a C-Pod supervisor for the Calcasieu Parish Sheriff's Office, testified that commissary is commonly traded for contraband in jail.

On cross-examination, Detective Abate agreed that it was usual for Defendant to have cash money on his commissary books. Detective Abate agreed that he would not disagree with defense counsel's suggestion that defense counsel had received substantial checks from Defendant's commissary account. Detective Abate also agreed that in Officer Bellar's statement regarding the incident, Officer Bellar stated that he clearly saw Defendant slip something into Mr. Andrews' pocket. Detective Abate agreed that he had been in the courtroom during trial and was aware that Officer Bellar did not state the same on cross-examination. Finally,

21

Detective Abate testified that when he was first told about the incident, he was told that the Defendant was seen placing the item in Mr. Andrews' shirt. Defense counsel objected to Detective Abate's testimony about what he was told, but the trial court allowed the testimony since it was not being offered for the truth of the matter asserted.

On re-direct, the State and Detective Abate had the following colloquy about Defendant's commissary account:

Q.    How is he getting substantial sums of money transferred to him to then reroute to defense counsel, or why would it go that route instead of whoever's putting money on his books just pay his defense counsel?

A.    So you want to know how he's getting the money, basically how they're putting it on?

Q.    (Indicating affirmatively.)

A.    Basically either a family member or friends will come and put money on your books so you can purchase off of commissary or whatever you need. Also what they'll do is, you know, Joe Blow wants some dope. He knows that, you know, this guy here can get it. They make arrangements for somebody on the street to go pay one of his people, and they give him the money, and then they'll go put it on the books in their name. So, it's kind of harder to trace.

Also another way that they'll make money is they'll try to get - - if I know you've got some charges and you can bond out, I know a guy at the bonding place, you know. I'm going to hook you up with this guy; and I'm going to get a hundred dollar cut off of it, and then they're going to come put money on my books for that too, so.

For the Defendant's case-in-chief, Ms. Teeter Carrier Chapman, Defendant's mother, testified. When asked how Defendant gets cash money on his book, Ms. Chapman replied:

A.    Me and - - me. A lot comes from me. Well, just recently when I called DOC to see about why he hadn't received his money at the facility it had been shipped to, they had told me they cut his check for $1,049. I - - we try to make sure he's comfortable. I mean, he's

already in a bad position, so we have to make sure he has everything he needs.

Q.    So y'all's family puts cash money on his books?

A.    Yes, sir.

On cross-examination, Ms. Chapman testified that while Defendant had been in jail, she had never received a cellphone call from him.

*Defendant's Argument in Brief*

In assignment of error number one, Defendant alleges the evidence was insufficient to prove he distributed a Schedule I controlled dangerous substance or controlled substance analogue classified in Schedule I. In assignment of error number two, Defendant alleges the evidence was insufficient to prove he was in actual or constructive possession of a controlled dangerous substance or controlled substance analogue classified in Schedule I, while in a municipal or parish prison or jail, on or about March 3, 2017.[1]

Regarding count one, Appellate counsel argues that Defendant does not contest that a tissue was found in Mr. Andrews' pocket but contests that Defendant was the one who placed the tissue in Mr. Andrews' pocket "or that he had

---

[1] Appellate counsel argues in brief that even though the State did not specify the contraband at issue in the second count of the bill, the evidence elicited at trial clearly indicated the State was seeking to prove a violation of La.R.S. 14:402(E)(5), which prohibits the possession or introduction of the following into or upon the premises of any municipal or parish prison or jail:

> (5) Any narcotic or hypnotic or excitive drug or any drugs of whatever kind or nature, including nasal inhalators of any variety, sleeping pills or barbiturates of any variety that create or may create a hypnotic effect if taken internally, or any other controlled dangerous substance as defined in R.S. 40:961 et seq. The introduction by a person of any controlled dangerous substance as defined in R.S. 40:961 et seq., upon the grounds of any municipal or parish prison or jail shall constitute distribution of that controlled dangerous substance and shall be subject to the penalties provided in R.S. 40:961 et seq.

La.R.S. 40:402(E)(5).

knowledge of the substance contained in the tissue." Defendant makes no other statement or argument in brief to substantiate his suggestion that he had no knowledge of the substance contained in the tissue. Further, defense counsel made no such argument in closing argument. Even if such argument had been made, the jury could have inferred Defendant's knowledge of the substance contained in the tissue by Deputy Smith's testimony regarding the previous incident (that occurred less than a month before the current offense) in which suspected synthetic marijuana was found in Defendant's cell. Considering Defendant's brief statement suggesting he had no knowledge of the substance in the tissue along with the lack of any other argument or evidence to substantiate such statement, Defendant has failed to prove any merit to this claim.

Regarding the second count, appellate counsel argues that the State cannot prove constructive possession of the alleged contraband. The factors to be considered to prove constructive possession are irrelevant since there was testimony that Defendant actually possessed the substance found in Mr. Andrews' pocket. Mr. Andrews testified that Defendant was the person who put the tissue in his pocket. Officer Bellar corroborated Mr. Andrews' testimony by testifying that he saw the tissue in Mr. Andrews' pocket immediately after Mr. Andrews came into contact with Defendant. Since the jury believed Mr. Andrews' testimony, the jury obviously believed Defendant actually possessed the synthetic marijuana found in the tissue.

The rest of Defendant's argument in brief attacks the credibility of Mr. Andrews' testimony. Appellate counsel points out that when Mr. Andrews was confronted by Officer Bellar immediately after the incident, Mr. Andrews did not name Defendant as the person who gave him the tissue. In fact, Defendant argues,

24

Mr. Andrews named "Nelson" as the person who gave him the tissue. Defendant further argues that even though Officer Bellar confronted Defendant shortly after the incident, Defendant denied giving the tissue to Mr. Andrews.

Appellate counsel also attacks Officer Bellar's testimony by noting that Officer Bellar watched Mr. Andrews through his "peripheral vision," admitting that he was not fixated on every move made by Mr. Andrews. Moreover, appellate counsel notes, Officer Bellar admitted at trial (contrary to his pre-trial statement to Detective Abate) that he did not actually see Defendant give anything to Mr. Andrews, and Officer Bellar admitted Mr. Andrews came within inches of several other inmates.

Appellate counsel further attacks the credibility of Mr. Andrews in several respects. Appellate counsel challenges Mr. Andrews' testimony that he did not know Defendant and had never spoken to Defendant before that day. According to appellate counsel, this is not consistent with Officer Bellar's testimony that the two inmates knew each other and would talk when Mr. Andrews served chow. Additionally, appellate counsel alleges this is not consistent with Mr. Andrews' claim that he knew Defendant was the person who spoke to him in the rec yard because he recognized Defendant's voice from Defendant's brief statement, "pass this to cell 7." Appellate counsel finally attacks Mr. Andrews' credibility by pointing out that Mr. Andrews initially stated the person who gave him the tissue was "Nelson," and then at trial stated he initially thought the person's name was "Gerald." Appellate counsel also attacks Mr. Andrews' credibility based on his criminal record.

Finally, appellate counsel argues that Mr. Andrews misidentified Defendant and that his identification is unreliable based on the test set forth in *Manson v.*

25

*Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977), for assessing the reliability of an identification. Appellate counsel contends:

> The record did not focus on Andrews' degree of attention. It did, however, provide information concerning the accuracy of his prior description of the offender - as noted above, he called him by two different names before identifying him in open court. The trial was held approximately seven months after the incident. Despite, [sic] the lack of information concerning most of these factors, there is little information to determine if Andrews based his identification solely on Henry's presence at trial, or possibly combined with Henry's prior conversations with him after the incident concerning whether he had told the deputies anything. The question the court must determine is whether it was reasonable to conclude that Andrews obtained the item from another inmate named "Nelson" but when he realized Jered Bellar believed it was Desmyne Henry who passed the item to Andrews, he went along with it for some unexplained reason. Relevant to this determination is the fact that the State called no witnesses to corroborate Andrews' testimony concerning his friends' supposed message to him that Henry would pay his bond if he would take the charge for him, that they heard the discussion between Andrews and Henry a few weeks after the incident when Andrews was in the rec yard, or, about the conversation the two supposedly had in the holding cells at the courthouse the day before Andrews testified where Henry purportedly told Andrews to plead the Fifth. Additionally, and most importantly, the pretrial factors discussed above do not address a situation like exists in the present case where the key witness was impeached for credibility purposes. *See* La. Code Evid. art. 609.1.
>
> The State was required to prove Desmyne Henry's identity as the person who handed the paper containing the synthetic cannabinoid to Andrews on March 3, 2017. Without this, the evidence was insufficient to prove both the distribution count as well as the possession of contraband count. The State failed to negate the reasonable probability of misidentification. The convictions should be overturned, the sentences set aside and acquittals should be entered of record.

*State's Argument in Brief*

The State argues that the other crimes evidence of Defendant's distribution of narcotics outside of prison shows that the behavior charged in the instant case was not unusual. Additionally, the finding of synthetic marijuana in Defendant's cell on another occasion, the State argues, shows that Defendant was in possession

of synthetic marijuana while incarcerated. As for direct evidence of the incident at issue, the State refers to Bellar's testimony, as well as Mr. Andrews' testimony.

*Analysis*

As stated previously, Defendant fails to substantiate his brief statement that he had no knowledge of what was in the tissue passed to Mr. Andrews. Additionally, although Defendant's brief discusses the law as to constructive possession, there is no question that the person who gave Mr. Andrews the tissue containing synthetic marijuana actually possessed the substance and possessed the substance in jail. The crux of Defendant's argument is that he is not the person who gave Mr. Andrews the tissue. In other words, Defendant argues that he was misidentified as the perpetrator of the crimes for which he was convicted. When the sole issue is Defendant's identity as the perpetrator, the supreme court has explained:

> [W]hen the key issue is the Defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297; *State v. Neal,* 00-0674 (La. 6/29/01), 796 So.2d 649. Positive identification by only one witness is sufficient to support a conviction. *Weary*, 03-3067 at p. 18, 931 So.2d at 311; *Neal*, 00-0674 at p. 11, 796 So.2d at 658; *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State v. Bright*, 98-0398, p. 22 (La. 4/11/00), 776 So.2d 1134, 1147.

*Hughes*, 943 So.2d at 1051.

As this court has previously stated:

> In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. The question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or

27

> in part, the testimony of any witness. The credibility of the witnesses will not be re-weighed on appeal.

*State v. Westmoreland*, 10-1408, p. 6 (La.App. 3 Cir. 5/4/11), 63 So.3d 373, 379, *writ denied*, 11-1660 (La. 1/20/12), 78 So.3d 140 (quoting *State v. Perry*, 08-1304, p. 2 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, 344, *writ denied,* 09-1955 (La. 6/25/10), 38 So.3d 352).

At trial, Mr. Andrews clearly identified Defendant as the person who put the tissue containing synthetic marijuana in his pocket. Mr. Andrews also testified about subsequent communication with Defendant regarding Mr. Andrews' statements to police, Mr. Andrews' willingness to "plead the Fifth" at trial, and Mr. Andrews' willingness to "take the charge." These statements were corroborated to some extent by Detective Abate's testimony that he overheard a phone conversation wherein Defendant was asking someone about Mr. Andrews. Mr. Andrews also testified about his prior convictions, his confusion as to the name of the person who gave him the tissue, and his lack of a plea deal for testifying. The jury was able to compare Mr. Andrews' testimony with Officer Bellar's testimony as to the incident in question. The jury was able to weigh Officer Bellar's testimony in light of his proximity to the incident, and Officer Bellar's acknowledgement that he did not actually see Defendant put the tissue in Mr. Andrews' pocket. The jury also heard testimony concerning Defendant's other crimes evidence. Although Mr. Andrews admittedly gave a name to police other than Defendant's name, there is no indication that Mr. Andrews physically identified someone other than Defendant. Thus, the jury could have concluded that Mr. Andrews was simply confused as to Defendant's name. After considering all of the above, the jury weighed the credibility of witnesses and obviously chose to

28

believe Mr. Andrews' identification of Defendant as the perpetrator. This court should not re-weigh the credibility of the witnesses in this case. Accordingly, Defendant's contention that Mr. Andrews' testimony was unreliable lacks merit as it does nothing more than seek to have this court re-assess witness credibility on appeal.

Accordingly, we find that the evidence was sufficient to find Defendant was the perpetrator of both distribution of a Schedule I controlled dangerous substance and possession of contraband in jail. Thus, these assignments of error lack merit.

### ASSIGNMENT OF ERROR NUMBER THREE

Defendant contends the trial court erred in allowing evidence of other crimes to be admitted at trial when the prejudicial effect of the evidence outweighed its probative value. A hearing as to the admissibility of the other crimes evidence was held on October 10, 2017. At the hearing, the State presented the testimony of Detective Michael Abate regarding two previous offenses of distribution of crack cocaine committed by Defendant on August 24, 2010 and September 9, 2010. As he testified at trial, Detective Abate testified that in both instances, a CI informed the detectives that Defendant wanted to sell crack cocaine. Detective Abate testified that the transactions took place, and Defendant supplied narcotics in exchange for money. Detective Abate identified Defendant in the courtroom. At the State's request, the trial court took judicial notice that Defendant pled guilty to two counts of distribution of a Schedule II controlled dangerous substance in front of the same trial court on September 26, 2016.

Detective Abate also testified as to an instance wherein Defendant possessed a cell phone in jail on December 20, 2014. As he testified at trial, Detective Abate testified that a cell phone was found in a pillow in Defendant's jail cell. According

29

to Detective Abate, the cell phone was considered contraband since it is illegal for an inmate to possess a cell phone. Again, at the State's request, the trial court took judicial notice that Defendant pled guilty to the charge of possession or introduction of contraband in jail in front of the same trial court on September 26, 2016.

The next other crimes evidence to which Detective Abate testified involved possession or introduction of synthetic marijuana in jail on February 18, 2017. As he testified at trial, Detective Abate testified at the pre-trial hearing that the deputies were performing a shakedown when they noticed Defendant running back toward his cell. Once Defendant was removed from the cell, and the cell was searched, a bag of synthetic marijuana was found in a bowl of Ramen noodles.

Finally, Detective Abate testified as to the offense of intimidating a witness that occurred between the dates of May 17, 2017 and May 25, 2017. Detective Abate described the offense as follows:

> A. Basically I was monitoring Desmyne's phone calls. While doing so, I overheard him talking about an individual he referred to as Tyrese or Tyrene. He wasn't actually sure how to say the individual's name. The guy he was talking to, he was asking him about it, and he described the individual as being 18 years of age possibly. He said he thinks his dad's known as "D.J. Cool Cat" or something. Basically he believes that that guy snitched on him. The individual he was talking to said, "Do you want me to get the business club out to look for him?" He said, "No, he's in jail."
>
> I started listening to some other phone calls where he was actually making threats to where, you know, if the guy snitched on him, he was going to do harm to him. Knowing what it was about and the person he was actually talking about, I called him into my office, asked him if he had ever spoke with Desmyne. He said yes, he had, and he said Desmyne did make threats towards him and felt scared for his personal safety, at which time we had to put him in another facility for his safety.

Q.     Now, Detective, this intimidation charge and this individual, this Tyrese individual, did this incident, the intimidation, stem from another incident?

A.     Yes.

Q.     And what was that?

A.     That was distribution of CDS I.

Q.     Which is the matter that we are about to go to trial on, correct?

A.     Correct.

Q.     Okay. So based on the incidence of that, that is what brought about the intimidation charge?

A.     Correct.

Q.     Okay. And the individual involved in each of these matters is the same Desmyne Henry that you had pointed out to the Court earlier?

A.     Yes, sir.

The State then presented argument to the trial court. The State argued Defendant's two previous convictions for distribution of crack cocaine were admissible to show Defendant's motive to gain something in return for the distribution of drugs and to show Defendant's knowledge of how to obtain and distribute drugs. As for Defendant's conviction for possession or introduction of contraband (cell phone) in jail, the State argued that such evidence showed Defendant's intent to possess contraband illegally, Defendant's ability to obtain contraband and conceal it, and Defendant's plan to use the contraband to carry out future endeavors. Likewise, the State argued that Defendant's possession of the synthetic marijuana found in the bowl of Ramen noodles on February 8, 2017, showed Defendant's ability to gain access to contraband, Defendant's intent to

possess contraband, and Defendant's knowledge of the contraband's presence in his possession.

Finally, the State argued that the other crimes evidence involving Defendant's intimidation of a witness was a "direct offshoot from the case at hand." The State argued:

> It does show a guilty knowledge of the defendant, of his own distributing drugs in jail, a lack of mistake of what he was doing at that time in placing it - - doing what he did in distributing it and an intent to conduct illegal activity, a distribution of CDS, possession of contraband.
>
> Judge, we believe that each of these matters shows proof, plan, opportunity, knowledge, intent of what he was trying to accomplish here in jail on this date. And for those reasons, Judge, we'd ask that these prior convictions and other crimes be admitted for consideration by the jury.

Defense counsel began his counter argument with a reminder to the trial court that it must make a finding regarding probative value versus prejudicial effect and a reminder that other crimes evidence "can't be introduced simply to prove that the defendant is a bad person or to impugn his character." With respect to the cell phone incident specifically, defense counsel argued that there was "simply . . . no connection to a drug charge whatsoever." Since such evidence had no probative value with respect to a drug charge, defense counsel argued that it was being offered strictly to impugn Defendant's character. As for the distribution offenses, defense counsel argued:

> Regarding the - - regarding the two distributions and the three matters that relate to drugs, again, - - and I know how these things usually go. What we're asking to do - - what we're asking the Court to do is simply weigh the prejudicial effect versus probative value, and the prejudicial effect is tremendous. I think it's something we can deal with at trial, but allowing all three of those instances into evidence I think is excessive. If the State wants to strike this blow, let them - - let them introduce one drug-related 404 contemplated charge.

The cell phone I think is ridiculous.  Piling on all of these - - all of these drug cases I think is excessive.

The State responded that even though the cell phone and drugs were not the same contraband, the cell phone incident showed Defendant's "knowledge, intent, plan, getting things into the jail, knowing how to get things into the jail, having them in the jail."  Although the State acknowledged that everything it sought to introduce against Defendant was prejudicial, it argued that the prejudicial effect of the evidence at issue was outweighed by the probative value of the evidence to show Defendant's intent, plan, and preparation.

Finally, defense counsel concluded:

> And clearly this type of evidence is prejudicial.  We understand that.  The State wants it to be prejudicial in introducing one act that is most closely congruent factually; it does the job.  Anything beyond that, respectfully, is excessive and so prejudicial that it - - that it works so much to the defendant's detriment and has so little probative value because it's simply a pile-on charge that it is excessive.

Before ruling on the admissibility of the evidence, the trial court clarified that the State was seeking to introduce two counts of distribution, the cell phone incident, possession of the synthetic marijuana found in the Ramen noodles, and the intimidating a witness incident.  The trial court then ruled as follows:

> Well, let me say this.  I mean, you know, it's always concerning to some degree, you know, to allow other things in, because there is a risk of undue prejudice.  But, you know, of course it's certainly probative.  I think all these things are probative because, first of all, there's always a concern about whether I find them to be probative.
>
> The cell phone issue, I mean, that's clearly a way to communicate, knowing that you're being recorded on the jail phones.  That's a way to try to communicate without being detected and about maybe how to get drugs in to him to be able to use or any other contraband.  So, I mean, I think the cell phone is certainly relevant and probative because that's an indication of - - and the fact that he had it hidden, and whatever, is a way that - - he knew he wasn't supposed to have it; I mean, he was convicted of that - - of that charge.

And, you know, it seems to me that that's certainly a mechanism to help figure out how to get drugs in there, number one, that are not - - and then the fact that he had the synthetic is proof that - - or, at least, you know, that it's probative because it showed that he's had something illegal in there in addition to just - - in other words, the cell phone's not illegal in and of itself. It's contraband. It's not supposed to be in there, but the - - you know, but it helps facilitate or it's certainly reasonable to think that it helps facilitate getting other - - you know, other illegal acts such as having drugs in there. And then he did have something that was illegal in and of itself, the possession of the synthetic marijuana.

And then to have sold - - to have sold it while he was in - - to have had the previous convictions show that that is something that he's, you know, - - it's a pattern of conduct on his part. In other words, I do think all of those things are relevant. I think they're probative, and I - - and, yeah, they are prejudicial. The only question is whether their probative value is outweighed by any undo [sic] prejudice. And I - - I don't see any basis really to limit it to say, okay, well you only get to talk about the cell phone, but you don't get to talk about the other things that are equally probative. I mean, they all are separate, and I think they are all probative in this case, and I do think that the probative value does outweigh any prejudicial effect that it would have in this case.

So as prejudicial as it may be, I mean, I think it's not unduly prejudicial based on the probative value. And so I am going to - - I'll allow - - and then we get to the - - I mean, and really I think you can - - I mean, I think the intimidation aspect of it is certainly - - certainly probative and relevant because it's directly related to this case and - - so anyway, so I am going to authorize - - I mean, I am going to allow all four of those other crimes to be introduced into evidence for the reasons that I stated.

At defense counsel's request, the trial court noted Defendant's objection for the record.

Although the trial court stated that it was going to allow "all four" of the other crimes incidents to be introduced into evidence, there were actually five incidents of other crimes evidence. Even though the State also stated that the incidents were four in number, the State was apparently referring to the two convictions for distribution as one incident. The State informed the court that

Defendant pled to two counts of distribution, which were charged in the same bill. Thus, despite the confusion as to the number of other crimes incidents admitted by the trial court, we interpret the trial court's ruling as admitting all of the incidents offered by the State, which were five in number.

*Defendant's Argument in Brief*

Appellate counsel argues the State failed to prove that the cell phone incident was connected to the current offenses. Appellate counsel also argues that the two counts of distribution of crack cocaine were not relevant in time, were not similar to the current offenses, did not prove an element in either of the current offenses, and were highly prejudicial. According to Defendant, the introduction of these convictions did nothing more than paint Defendant in a bad light and highlight his long-term incarceration. As for the other two instances of other crimes evidence—the synthetic marijuana found in Ramen noodles in Defendant's jail cell and the intimidation of Mr. Andrews —Defendant contends the State failed to sufficiently prove those offenses. Defendant argues that the State failed to prove the substance removed from the Ramen noodles was, in fact, synthetic cannabinoids and failed to prove that Defendant committed the crime of intimidation of a witness. The information provided at the pre-trial hearing on the admissibility of this evidence, Defendant contends, "fell short of what was required to satisfy the proof elements as to these offense [sic] for admission at trial."

*State's Argument in Brief*

The State counters by arguing that the other crimes evidence was necessary to show Defendant's motive, preparation, and plan to possess and distribute the drug contraband within the prison. This evidence, the State contends, was related and intertwined with the current charges, was relevant, and was necessary.

Accordingly, the State argues that the trial court did not abuse its discretion in allowing the prejudicial evidence to be introduced at trial.

*Analysis and Jurisprudence*

The supreme court has held that a "district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *State v. Taylor*, 16-1124, 16-1183, p. 18 (La. 12/1/16), 217 So.3d 283, 296. Louisiana Code of Evidence Article 404(B) provides, in pertinent part:

> **B. Other crimes, wrongs, or acts.** (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

In *Taylor*, 217 So.3d at 291 (emphasis in original), the supreme court stated the following regarding the State's burden of proving the commission of the other crimes evidence:

> [W]e now recognize and hold that when seeking to introduce evidence pursuant to La. C.E. art. 404(B), the state need only make a showing of *sufficient* evidence to support a finding that the defendant committed the other crime, wrong, or act.

Additionally, the supreme court stated:

> Code of Evidence article 404(B)(1) embodies the settled principle that evidence of other crimes may be admissible if the state establishes an independent and relevant reason for its admission. . . . Moreover, even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence must have substantial relevance independent from showing defendant's general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. . . . It is the duty of the district court in its gatekeeping function to determine the independent relevancy of this evidence. The district court must also

balance the probative value of the other crimes, wrongs or acts evidence against its prejudicial effects before the evidence can be admitted.

*Id.* at 292 (citations omitted).

Before addressing the merits of Defendant's arguments on appeal, we note that not all of Defendant's arguments are properly before this court on appeal. It is well-settled that a Defendant may not raise an argument on appeal that was not asserted in a contemporaneous objection at trial. La.Code Crim.P. art. 841. "This rule applies to instances where a party objected to the introduction of evidence at trial on one ground but either adds to or changes the basis for challenging the evidence on appeal." *State v. Landry*, 08-318, p. 6 (La.App. 3 Cir. 10/1/08) (unpublished opinion) (citing *State v. Clayton*, 427 So.2d 827 (La.1982); *State v. Ford*, 349 So.2d 300 (La.1977)).[2]

At the pre-trial hearing in the present case, Defendant objected to the cell phone incident as being totally unrelated to the drug charges currently at issue. Defendant also appeared to concede that all of the drug related offenses were relevant and admissible but contended that the State's introduction of all of the other crimes incidents involving drugs was "simply a pile-on charge that it [sic] is excessive." Defendant's counsel made no argument pertaining to the intimidation of a witness incident. Considering the arguments asserted at the pre-trial hearing, we find that the following arguments alleged by appellate counsel were not raised in the trial court and should not be considered on appeal: 1) that the two convictions of distribution of crack cocaine were not relevant in time, were not similar to the current offenses, did not prove an element of the current offense, and were highly prejudicial standing alone; 2) that the introduction of those

_____

[2]This case is cited at 2008 WL 4415697.

37

convictions did nothing more than paint Defendant in a bad light and highlight his long-term incarceration; and 3) that the State failed to sufficiently prove the incident involving the synthetic marijuana found in the Ramen noodles and the incident involving Defendant's intimidation of Mr. Andrews. Although appellate counsel makes some specific arguments regarding the cell phone conviction that were properly preserved and should be addressed, appellate counsel does not argue anything regarding trial counsel's "pile-on" argument asserted at the pre-trial hearing. Thus, we find that the "pile-on" argument is abandoned. Uniform Rules—Courts of Appeal, Rule 2–12.4(B)(4). *State v. Cofer*, 16-871 (La.App. 3 Cir. 4/5/17), 216 So.3d 313, *writ denied*, 17-1150 (La. 5/11/18), 241 So.3d 1014.

Regarding the other crimes incident involving the cell phone, both trial counsel and appellate counsel argue that the State failed to prove the cell phone incident was connected to the current offenses. Specifically, appellate counsel argues that the State offered no proof that the cell phone was used in any way to obtain drugs:

> There was no testimony concerning the call log on the phone, a search of the Sims card or any other indication that the cell phone was used to commit a crime. Additionally, the cell phone was taken from Henry's possession in 2014. The drugs at issue concern an alleged distribution (and thus possession) in 2017. Thus, the cell phone was in no way connected to this charge. Additionally, this charge occurred after the February 18, 2017, shakedown where the deputy testified that Henry's person and cell was searched and no other drugs were found.

Although the cell phone found in Defendant's cell was not a drug, it was nonetheless contraband found in Defendant's jail cell. We agree with the trial court that the cell phone was relevant to show Defendant's possession of contraband while in jail and relevant to show a means by which Defendant could communicate regarding illegal activity. Because of Defendant's claim that he was

38

not the person who gave Mr. Andrews the tissue containing contraband (synthetic marijuana), the evidence of Defendant's prior possession of contraband in jail was relevant and highly probative to prove opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Furthermore, we find that the trial court did not abuse its discretion in finding the probative value of all of the other crimes evidence outweighed the prejudicial effect of such evidence.

*Harmless Error Analysis*

In *State v. Garcia*, 09-1578, p. 55 (La. 11/16/12), 108 So.3d 1, 39, *cert. denied*, 570 U.S. 926, 133 S.Ct. 2863 (2013), the supreme court stated the following with respect to the applicability of harmless error to the erroneous admission of other crimes evidence:

> Finally, the erroneous admission of other crimes evidence has long been held subject to harmless error review. La.Code Crim. Proc. art. 921; *State v. Johnson,* 94–1379, pp. 14–15 (La.11/27/95), 664 So.2d 94, 100–01 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict "surely unattributable" to error)(quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).

As stated in the assignment of error regarding the sufficiency of the evidence, Defendant was identified by Mr. Andrews as the perpetrator of the offenses at issue. The jurisprudence is clear that the testimony of one witness is sufficient to convict a defendant. Consequently, even if the other crimes evidence was erroneously admitted, the error would be harmless. Accordingly, this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

Defendant argues that he was denied the right to a fair trial because the State improperly referred to his choice to remain silent during closing argument.

Defendant specifies two instances in which he contends the State impermissibly referred to his right to remain silent. The first instance is the following:

> We talked about defendant's right to remain silent. The judge is going to tell you, you can't hold it against him. The defendant is not required to testify. No presumption of guilt may be raised and no inference of any kind can may [sic] be drawn from the fact the defendant did not testify. I'm with that 100 percent. That's our laws.

Appellate counsel acknowledges the State's argument that it was simply stating the law, but asserts, without citing any authority, that any mention of Defendant's choice to exercise his Fifth Amendment privilege was improper and placed emphasis on Defendant's silence. Appellate counsel argues that this is especially true in light of the following statement by the State in its rebuttal closing argument:

> Don't pay any attention to the fact that his client does not once say, "Well, here's the deal, ladies and gentlemen." He says, you know, "It's often in my line of work that inmates always have the law wrong." If he's innocent, he doesn't have to worry about audio/video. He doesn't have to worry about marked currency. I'd be pounding on that phone on my door to my attorney, "I didn't have anything. It wasn't in my possession, actual or constructive. I have no idea what they're talking about."

Appellate counsel argues that the above excerpt was a direct reference by the State to Defendant's failure to testify and claim his innocence. Considering the two remarks, appellate counsel contends that Defendant's constitutional right to remain silent was violated and should not be considered harmless.

After closing arguments, closing instructions, and the jury's retirement to deliberations, defense counsel stated the following:

**MR. WHITE:**

> I have to *pro forma* enter a motion, without argument. I'm moving for a mistrial for the purpose that the Fifth Amendment privilege was mentioned in closing arguments. But I have no - - I have no further exposition or leverage.

**MR. MURRAY:**

Judge, I simply read from the jury instructions, - -

**MR. WHITE:**

I know.

**MR. MURRAY:**

--Your Honor.

**MR. WHITE:**

There's no argument.

**THE COURT:**

Yeah.  I'm just wondering - - okay.  I don't recall what I - - what I may have missed on that, but anyway, I don't - - it didn't stand out to me.  So anyway, I'm going to deny the motion for mistrial.

**MR. WHITE:**

We just ask that the Court note our objection for the record.

**THE COURT:**

All right.  The objection is noted for the record.

Subsequently, Defendant filed a Motion for New Trial, stating the following:

During closing arguments, counsel for the State pointedly referenced Defendant's exercise of his 5th Amendment right not to testify at trial.  Defendant was prejudiced thereby in that his decision not to testify was emphasized, thereby drawing the Jury's attention to his silence and implicitly framing same as both an appropriate subject for closing argument and as a matter to be considered during deliberations.

In the motion, defense counsel stated that before any arguments were heard regarding the motion for new trial, he would file a memorandum in support.  It does not appear, however, that any memorandum was filed nor does it appear that any arguments were heard.  The trial court denied the motion by written order.

41

Defendant also filed a "Motion for Amendment, Modification or Reconsideration of Sentence" due to the State's reference to Defendant's right to remain silent. The trial court denied the motion on December 14, 2018.

Regarding the first alleged improper argument, the State contends that the prosecutor was simply stating the law applicable to the case (which was later referred to in jury instructions) and was not referring to Defendant's failure to testify. As the State asserts, argument as to the law applicable to the case is permissible argument. La.Code Crim.P. art. 774.

The second alleged improper argument, the State contends, was a response to defense counsel's attempt in his closing argument "to explain away the jail calls the jury heard" and was not a reference to Defendant's failure to testify. Additionally, the State argues that trial counsel did not mention the second improper argument when he moved for the mistrial. Thus, any argument on appeal as to the second allegation of improper argument is waived. La.Code Crim.P. art. 841.

Furthermore, the State asserts that trial counsel's motion for mistrial as to the first alleged improper reference was not timely since it was made after both sides presented closing arguments, after a jury recess, after the jury instructions, and after the jury had been dismissed to deliberate. This court has stated the following regarding the timeliness of a motion for mistrial:

> While counsel for defendant promptly objected to the remark about the mandatory penalty made by the State during rebuttal argument, counsel did not contemporaneously move for a mistrial or request the court to admonish the jury to disregard the State's remark. Defense counsel also did not contemporaneously object to or move for a mistrial when the District Attorney made a statement about a possible probated sentence for manslaughter. It was not until after the jury was instructed on the law by the court and had retired to begin deliberations that defense counsel made his motion for a mistrial and

42

presented his arguments in support of the motion. The trial court denied the motion.

LSA-C.Cr.P. Art. 841 provides, in part, that:

"An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. . . ."

The Louisiana Supreme Court has recognized that an objection or a motion for a mistrial is timely when the motion is made upon conclusion of the closing argument or shortly thereafter. *State v. Gaines*, 347 So.2d 1153 (La.1977); *State v. Lee,* 346 So.2d 682 (La.1977). However, in the present case, defense counsel did not move for a mistrial until after the jury had been instructed and retired to begin deliberating. This was not at the conclusion of the closing argument or even shortly thereafter.

The purpose of the contemporaneous objection rule is twofold: (1) to put the trial judge on notice of any alleged irregularity so that he may immediately cure the problem and (2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by timely objection and request for an admonition or mistrial. *State v. Thomas*, 427 So.2d 428 (La.1982); *State v. Falls*, 544 So.2d 27 (La.App. 4 Cir.1989). Requiring a contemporaneous motion for a mistrial prevents defense counsel from sitting on an error and gambling unsuccessfully on the verdict. *State v. Arvie*, 505 So.2d 44 (La.1987).

Because there was no contemporaneous objection to the District Attorney's remark about the possibility of a probated sentence for a conviction of manslaughter and because the motion for a mistrial, in this case, was not made until after the court had instructed the jury and retired it to deliberate, the court was, in effect, denied the opportunity to admonish the jury and immediately cure any alleged prejudicial effect the District Attorney's remarks may have had. For these reasons, we find that the defendant's motion for a mistrial was untimely and, therefore, on appeal we cannot consider the trial court's denial of this motion as error. La.C.Cr.P. Art. 841.

*State v. Ebarb*, 558 So.2d 765, 769-70 (La.App. 3 Cir. 1990).

Likewise, by failing to present any objection or motion for mistrial, Defendant waived his right to complain of the second alleged improper argument in the trial court. Additionally, even though Defendant did request a mistrial as to the State's first alleged improper argument, the motion was untimely.

Furthermore, Defendant did not offer any argument or law to support the motion for mistrial. Thus, we find that Defendant failed to preserve any argument on appeal as to the allegedly improper references by the State to his failure to testify.

For the foregoing reasons, this assignment lacks merit.

## ASSIGNMENT OF ERROR NUMBER FIVE

In his final assignment of error, Defendant contends that the mandatory life sentence imposed by the trial court is excessive and that a downward departure was appropriate. This claim has been rendered moot by the error patent discussed above.

## DECREE

Defendant's convictions are affirmed. Defendant's life sentence for distribution of controlled dangerous substance, Schedule I, is vacated and the case remanded for resentencing, with the trial court instructed to apply the version of La.R.S. 15:529.1 as it was amended by 2017 La. Acts. 282 and before its amendment by 2018 La. Acts 542. Additionally, Defendant's sentence for introduction of contraband into or upon the grounds of a state correctional institution is vacated, and the case remanded for resentencing with the trial court instructed to specify whether the sentence is to be served with or without hard labor.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; AND REMANDED WITH INSTRUCTIONS.**